Filed 7/1/19

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER WEAVER,<br><br>    Defendant and Appellant. | H045301<br>(Santa Cruz County<br> Super. Ct. No. 16CR04023) |

A jury convicted appellant Christopher Weaver of making criminal threats and exhibiting a deadly weapon. The trial court sentenced Weaver to four years in prison. On appeal, Weaver claims that the trial court erred by failing to hold a hearing on a *Marsden*[1] motion and by admitting evidence of a prior uncharged battery under Evidence Code section 1101, subdivision (b). In supplemental briefing, Weaver contends that recently enacted Penal Code section 1001.36, allowing for pretrial mental health diversion, retroactively applies to him, and that his case should be remanded to the trial court for a hearing on his diversion eligibility.

For the reasons explained below, we conditionally reverse the judgment and remand the matter to the trial court for a hearing under Penal Code section 1001.36 to determine whether to grant Weaver mental health diversion. We reject Weaver's remaining claims.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II(A) and II(B).

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

# I. FACTS AND PROCEDURAL BACKGROUND

## A. *Procedural Background*

In April 2017, the Santa Cruz County District Attorney filed an information charging Weaver with two counts of making criminal threats (Pen. Code, § 422; counts 1 & 2),[2] and misdemeanor exhibition of a deadly weapon (§ 417, subd. (a)(1); count 3). The information further alleged as to count 2 that Weaver personally used a deadly or dangerous weapon while committing the charged offense (§ 12022, subd. (b)(1)), and as to counts 1 and 2 that Weaver had suffered one prior serious felony conviction for violating section 459 (§ 667, subd. (a)(1)), one prior strike conviction (§ 667, subds. (b)-(i)), and six prior convictions resulting in prison terms (§ 667.5, subd. (b)).

Weaver's prosecution began with the filing of a felony complaint in June 2016. An attorney from the public defender's office, Jon Minsloff, represented Weaver at his arraignment on the complaint. At the next court appearance on July 15, 2016, Nicola Whitehead, an attorney from a law firm that had been representing Weaver on other pending cases, appeared and requested that her firm also be appointed on this case. The trial court granted the request, relieved the public defender, and appointed the "Page firm" to represent Weaver. At the July 15 court appearance, Whitehead declared a doubt about Weaver's mental competence. The trial court suspended the proceedings pursuant to section 1368 and ordered an evaluation of Weaver by Dr. Thomas Reidy. Dr. Reidy evaluated Weaver, diagnosed him as suffering from schizophrenia, and concluded that he was not competent to stand trial. Dr. Reidy explained that Weaver "demonstrates impairment to such a degree that he cannot rationally participate in the court proceedings, and in particular, cannot rationally and consistently communicate with his attorney due to prominent and acute mental health symptoms."

---

[2] Unspecified statutory references are to the Penal Code.

At the next court appearance on August 2, 2016, the trial court found Weaver incompetent to stand trial based on Dr. Reidy's evaluation and ordered that the proceedings remain suspended. On August 16, 2016, the trial court ordered Weaver transferred to Atascadero State Hospital (Atascadero) until his restoration to competency.

At a later court appearance, the trial court appointed a second expert, Dr. Gregory Katz, to evaluate Weaver's competence. The trial court subsequently considered Dr. Katz's report—which concurred with Dr. Reidy's opinion concerning Weaver's incompetence—and continued to hold the proceedings suspended, pending Weaver's transportation to Atascadero for restoration of competency. Weaver was transported to Atascadero. While Weaver was at Atascadero, doctors there diagnosed him with schizoaffective disorder in partial remission.

Approximately two and a half months later, Weaver was transported back from Atascadero to Santa Cruz County. On January 19, 2017, Weaver appeared in court with new defense counsel from the Page law firm, Mitchell Page.[3] Based on a certification of mental competency and a doctor's report from Atascadero, the trial court found Weaver competent and resumed the proceedings. At defense counsel's request, the court directed the county's mental health department to explore possible programs to which Weaver could be released pending trial.

On January 24, 2017, the trial court ordered that Weaver be released to a residential mental health treatment facility pending trial. As a condition of his release, Weaver agreed to such placement and to continue taking medications as prescribed.

On March 10, 2017, the trial court revoked Weaver's release after Weaver was discharged from a mental health program because he failed to follow the directions of the

---

[3] Page remained Weaver's counsel for the rest of the case. However, at six pretrial proceedings after Page took over the representation, different counsel appeared in Page's stead. Minsloff appeared with Weaver on one of those occasions. Nicola Whitehead never appeared with Weaver after Weaver was transported to Atascadero.

program's staff. Nevertheless, the trial court ordered the county's mental health department to find a new placement for Weaver. Thereafter, Weaver was released to another mental health program. On April 10, 2017, the trial court conducted a preliminary hearing, held Weaver to answer, revoked Weaver's release to the mental health program, and remanded Weaver into custody. The trial court noted that Weaver had been "released at least twice to programs and they're not working."

On June 6, 2017, the trial court granted the district attorney's motion to dismiss the prior strike and prior serious felony conviction allegations. The parties subsequently explained that the information charged only three prior prison terms.

In October 2017, a jury heard evidence and found Weaver guilty of counts 1, 2, and 3. The jury further found true the deadly weapon allegation in count 2. Weaver subsequently waived his right to trial on the remaining allegations and admitted the three prison prior allegations.

On November 28, 2017, the trial court sentenced Weaver to a total term of four years and eight months in prison and imposed various fines and fees. The trial court later corrected a sentencing error and reduced the total prison term to four years.

### B. *The Evidence Presented at Trial*

#### 1. The Prosecution Evidence

In June 2016, Weaver was homeless. Paige C.[4] volunteered at a soup kitchen for the homeless in Santa Cruz. On June 6, Weaver visited the soup kitchen and "started yelling and screaming" in the soup kitchen's courtyard. Paige approached Weaver and asked him what was wrong. Weaver demanded to use the soup kitchen's shower. Paige explained to Weaver the scheduling rules for the shower. Weaver got within inches of Paige's face, called her a racist bitch, and spat in her face. Weaver left the soup

---

[4] To protect the victims' privacy, we first refer to them by their first names and the first initial of their last names and, in the rest of the opinion, by their first names only. (Cal. Rules of Court, rule 8.90(b)(4).)

kitchen after Paige threatened to call the police.  The encounter lasted "about five or six minutes."

On June 13, 2016, Weaver returned to the soup kitchen around 12:55 p.m., "again yelling, screaming, carrying on, and telling everybody he's going to take a shower no matter what [any staff member] said."  Paige explained to Weaver that he was too late to sign up for and use the shower.  Weaver got within inches of Paige's face and spat on her, insisting that "he was going to take a shower."  When Paige reiterated that Weaver could not use the shower, he "raised his fists at [her] and said, 'When I see you again, I'm going to kill you.' "  Weaver specifically threatened to "slice [her] up" and "slice [her] open."  He also called Paige "a racist bitch."  He said, " 'You're a cunt,' and 'You're just a racist white woman, and you're just out for a black man. . . .' "  Other homeless persons told Weaver to leave, which he did about 15 minutes after he had arrived.  Paige took Weaver's threats to kill her "literally" and "seriously," and she was "[t]errified."  The June 13 incident with Paige formed the basis of the criminal threats charge in count 1.

On the evening of June 16, 2016, Paige and her husband, Damon B., went out for ice cream in downtown Santa Cruz.  While eating outside the ice cream shop, they heard a person yelling, cussing, and "creating a scene" in the distance.  Paige recognized the voice as Weaver's and told Damon that the yelling man was the one who had threatened to kill her.  Weaver then walked by Paige and Damon; he appeared "angry, mad at the world."  Weaver looked at Paige, continued walking for a short distance, then "thr[ew] his stuff down, turn[ed] around and c[ame] after" her and Damon.  Damon got in between Paige and Weaver.  As Weaver approached, he "start[ed] screaming about [them] being racist, and he said that he was going to slice [Damon] and he would do the same to [Paige]."  Weaver said, " 'I'll slice you, and I'll slice your white woman.' "  About two or three minutes into the confrontation, Weaver pulled out a folded pocketknife, held it next to Damon's cheek, and said he would cut Damon like he would cut Paige.  Weaver's

5

threats caused Damon to fear for his and Paige's safety. The June 16 incident with Damon formed the basis of the criminal threats charge in count 2.

Paige called 911 during the confrontation on June 16. Santa Cruz Police Officer Caitlin McBride responded to the call with a fellow officer. The police found a folding knife with a three-inch blade in Weaver's pocket. Weaver was "yelling and cussing" during the interaction with police. Officer McBride believed that Weaver was likely under the influence of a stimulant.

Richard S. testified about an uncharged encounter he had with Weaver at a 7-Eleven store in Santa Cruz on March 28, 2016.[5] As Richard was getting into his car outside the store, he heard a loud commotion inside. When Richard looked into the store, he saw a person at the counter (later identified as Weaver) yelling at the store clerk. Richard walked back into the store and heard the man yelling at the clerk, "You're a racist." Richard noticed that the man had a long hunting knife "in a sheath on his side." Richard yelled out that the man had a knife and warned him not to "pull that knife." The man asked Richard what he was going to do about it. The man moved toward Richard in a "challenging manner," and Richard tried to get him out of the store. Richard told the clerk to call the police and put up his hands to prevent the man from moving toward the clerk. The man then struck Richard twice in the head. Richard asked the man, "Do you realize what you've done?" The man got in Richard's face, yelled, and spat on him.

2. The Defense Evidence

Weaver was the sole defense witness, and the defense did not offer any evidence other than his testimony. Weaver testified that he had difficulty speaking clearly because he had been struck by an automobile in 2004 and suffered extensive injuries to his face. He also testified about the circumstances of his homelessness.

---

[5] This incident was the subject of an in limine motion and admitted under Evidence Code section 1101, subdivision (b).

Weaver had many times visited the soup kitchen for showers and meals. He had seen Paige there before the incidents in June 2016, but he had not interacted with her previously. Weaver admitted that he unsuccessfully tried to get a shower on June 6 and June 13. On June 13, Weaver put his name on the shower list but left the shower line to console a distraught friend. When Weaver returned to the shower line, a volunteer told him he had been gone for half an hour and could not shower that day. Weaver insisted that he was not absent for that long and was going to take a shower. The volunteer then told Paige that Weaver was not following directions and could not use the shower. After Paige supported the volunteer's decision, Weaver "called her a bitch and told her she was wrong for not letting [him] take a shower." Weaver "[did] not recall" whether he said the things that Paige testified to; Weaver "was upset at the time" of the incident.

Weaver testified further that when he walked by Paige and Damon on June 16, he heard Paige say, " 'There goes that nigger that threatened me at work the other day.' " Weaver "turned around and . . . looked" at the couple, who then "started, 'We're calling the cops.' " Weaver testified that he did not "recall saying the things" that Damon reported. Weaver was still upset on June 16 that he had not gotten a shower on June 13.

Weaver recalled the 7-Eleven incident. He testified that the store clerk working that day had refused to give him water for free, even though other clerks at that store had done so previously. Weaver denied that he had yelled at or threatened the clerk, but Weaver acknowledged that he was upset, complained about the charge for water, and felt he was treated unfairly. Weaver recalled that Richard had said, " 'He's got a knife. Call the police.' " Weaver did not recall speaking to Richard in the manner to which he testified. Weaver said he "was upset, but [he] wasn't upset to call any racial names, or anything like that, you know." Weaver "didn't mean for any of the things that [he] said to be taken seriously." He was "just upset and . . . unmedicated," and when he is unmedicated, he has "a problem communicating[,] a problem problem solving, and . . . a problem . . . being grounded."

7

On cross-examination, Weaver testified that he felt he had been targeted when he was not permitted to shower while others were. Weaver acknowledged that he had yelled at Paige on June 6 because he was upset about not getting a shower, but he denied spitting on her. Weaver also testified that he had lost his place in the shower line while consoling his friend on June 6, rather than on June 13. Weaver then said that he had only one interaction with Paige at the soup kitchen—not two—and he could not remember whether the interaction was on June 6 or June 13. During their interaction, Weaver had called Paige a "bitch," but he did not "recall calling her a racist" and he did not intentionally spit on her. Weaver admitted that he "may have . . . cursed [Paige] out [and] even called her a racist bitch, but [he] never recall [*sic*] saying, 'I'm going to kill you. I'm going to pull out your guts and let people laugh.' " Weaver also denied threatening Paige's life.

Regarding the June 16 confrontation, Weaver added that he said, " 'Screw you' " to Paige and said to her "verbatim," " 'Keep your "niggers" to yourself.' " Weaver did not recall whether he called Paige a racist bitch during this incident. Weaver admitted that he had removed a knife from his pocket, but he denied placing the knife next to Damon's face or threatening to kill him.

Weaver did not remember calling the clerk at the 7-Eleven a racist. Weaver testified that he had said, "Screw you," to Richard, who then grabbed Weaver. In turn, Weaver struck Richard. Weaver testified that, although he was upset at the time of this incident, he recalled having said to Richard, "You touch me again, I'm going to knock you out," and "Call [the police]. I don't care. You think every nigger is going to run every time you call the cops."

## II. DISCUSSION

Weaver raises three claims on appeal. First, he contends that a letter he filed with the trial court requested replacement of his defense counsel under *Marsden*, and the trial court committed prejudicial error when it failed to hold a hearing on that request.

8

Second, Weaver claims that the trial court erred when it admitted evidence under Evidence Code section 1101, subdivision (b), of the uncharged incident involving Richard S. Finally, Weaver contends that section 1001.36 applies to him retroactively, and we should remand his case to the trial court for a hearing to determine his eligibility for pretrial mental health diversion.

A. *Marsden Motion*

1. Additional Factual Background

At his arraignment on June 20, 2016, Jon Minsloff from the public defender's office represented Weaver. At the next court appearance on July 15, 2016, upon request of Nicola Whitehead, the trial court appointed the "Page firm" to represent Weaver. That same day, Whitehead declared a doubt about Weaver's mental competence, and the trial court suspended the proceedings and ordered a mental evaluation by Dr. Reidy. On August 2, 2016, the trial court found Weaver incompetent based on Dr. Reidy's report. On August 16, 2016, the trial court ordered Weaver's transfer to Atascadero State Hospital for restoration of competency. At the beginning of the August 16 proceeding, Weaver asked to address the court, stating, "Your Honor, permission to speak freely?" The trial court asked Weaver to "[g]ive [the court] one second" to review a placement report, and subsequently allowed Weaver to speak, saying "Go ahead, Mr. Weaver. You had something to say. Thank you again for your patience." Weaver proceeded to ask a question about the potential sentencing ranges previously described by the court and expressed his desire to take a polygraph test because it would show the prosecution's case was not credible when compared to his statements. Weaver also asked the court if it would send him to a mental health program.

On August 22, 2016, Weaver filed a letter with the trial court expressing dissatisfaction with Whitehead's representation. Specifically, Weaver wrote, "When I caught this case at my first appearance [Whitehead] said[,] after I explained to her how I wanted to take this case to trial[,] she told me [*sic*] about trying to get a favorable plea by

9

asking one of her doctor friends to interview me and try to get an incompetent to stand trial verdict." Weaver also said that he "wish[ed] to relieve Ms. Whitehead of her position in defending [him] and ask[ed] for a second opinion and attorney like Jon Minsloff. I am more confident in his manner of defense because he is aggressive and precise in his viewing of people and matterials [*sic*]."

In September and October 2016, Whitehead twice appeared briefly in court with Weaver. At the first appearance on September 29, the trial court noted that the "defendant is requesting at this point another [competency] expert, so we'll go ahead and make that order and get Dr. Katz involved." Weaver personally thanked the court for its order. At the second appearance on October 12, Whitehead noted that Dr. Katz's report "doesn't change anything," and the trial court continued to hold the proceedings suspended pursuant to section 1368.

Whitehead made her final appearance on this case in late October 2016, after Weaver had been transported to Atascadero. The appellate record does not contain a reporter's transcript for this court appearance, but the minute order indicates that the trial court simply ordered the matter off calendar. Thereafter, Weaver was represented in this case by Mitchell Page of the Page law firm.

Weaver's letter was file-stamped as filed by the trial court. Nothing in the record indicates whether the judge to whom Weaver's letter was addressed (Judge Salazar), who presided over Weaver's case prior to trial, was aware of the letter. Neither the trial court, Weaver, nor Weaver's counsel ever mentioned or addressed Weaver's letter on the record.

### 2. Applicable Legal Principles

"In California, the 'seminal case regarding the appointment of substitute counsel is *Marsden* . . . , which gave birth to the term of art, a "*Marsden* motion." ' " (*People v. Sanchez* (2011) 53 Cal.4th 80, 86 (*Sanchez*).) In *Marsden*, the California Supreme Court explained that "criminal defendants are entitled under the Constitution to the assistance of

10

court-appointed counsel if they are unable to employ private counsel.  However, the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden*, *supra*, 2 Cal.3d at p. 123.)

"[A]t any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated, pursuant to [the] holding in *Marsden*, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney.  [Citation.]  In turn, if the defendant makes a showing during a *Marsden* hearing that his right to counsel has been ' " 'substantially impaired' " ' [citation], substitute counsel must be appointed as attorney of record for all purposes." (*Sanchez, supra*, 53 Cal.4th at p. 90, fn. omitted; see also *People v. Rodriguez* (2014) 58 Cal.4th 587, 623.)  " '[A] proper and formal' *Marsden* motion is not required—the defendant need only clearly indicate to the trial court 'in some manner' that he or she is requesting the discharge and replacement of appointed counsel." (*People v. Armijo* (2017) 10 Cal.App.5th 1171, 1178 (*Armijo*).)

"[W]hile the trial court may not 'proceed with the case against the defendant' before it determines his competence in a section 1368 hearing [citation], it may and indeed *must* promptly consider a motion for substitution of counsel when the right to effective assistance 'would be substantially impaired' if his request were ignored." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 88; see also *People v. Solorzano* (2005) 126 Cal.App.4th 1063, 1069; *People v. Harrison* (2001) 92 Cal.App.4th 780, 789 (*Harrison*).)

The California Supreme Court "held in *Marsden* that it was prejudicial error to deny the defendant the opportunity to explain the basis for his [or her] claim because a trial court that 'denies a motion for substitution of attorneys solely on the basis of [its] courtroom observations, despite a defendant's offer to relate specific instances of

11

misconduct, abuses the exercise of [its] discretion to determine the competency of the attorney' [citation], and, in that case, [the Supreme Court] could not 'conclude beyond a reasonable doubt that this denial of the effective assistance of counsel did not contribute to the defendant's conviction.' " (*Sanchez*, *supra*, 53 Cal.4th at p. 92.)

A defendant who makes a *Marsden* motion may, however, by his later conduct, waive or abandon his request for a *Marsden* hearing. (*People v. Jones* (2012) 210 Cal.App.4th 355, 361–362 (*Jones*); *People v. Vera* (2004) 122 Cal.App.4th 970, 981-982; see also *People v. Stanley* (2006) 39 Cal.4th 913, 933 [abandonment of self-representation rights by later acceptance of appointed counsel without renewal of self-representation request].) Relatedly, our Supreme Court has held that "[i]f the trial court's failure to hear or rule on [a] new trial motion appears to be inadvertent, the defendant must make some appropriate effort to obtain the hearing or ruling." (*People v. Braxton* (2004) 34 Cal.4th 798, 813.) Moreover, a trial court's failure to consider a *Marsden* motion may "bec[ome] harmless when [the defendant] fail[s] to reassert the reasons underlying the motion at [a] later [*Marsden*] hearing." (*People v. Lloyd* (1992) 4 Cal.App.4th 724, 732; see also *People v. Leonard* (2000) 78 Cal.App.4th 776, 787–788; *Harrison*, *supra*, 92 Cal.App.4th at p. 790.)

### 3. Analysis

Weaver contends that the trial court erred by failing to hold a hearing after it received his letter requesting that Whitehead be relieved and asking for "a second opinion and attorney." Weaver asserts that he never withdrew or abandoned his *Marsden* request, and the failure to hold a hearing cannot be deemed harmless on this record. The Attorney General does not dispute that Weaver's letter constituted a proper *Marsden* motion and does not contend that the trial court never received the letter. The Attorney General instead argues that Weaver "effectively abandoned" his *Marsden* claim as moot when he failed to pursue the *Marsden* motion after obtaining his desired change in defense counsel.

We agree with Weaver that after receiving his letter the trial court should have promptly considered Weaver's request that Whitehead be relieved. The trial court should also have provided Weaver an opportunity to further explain the grounds for his dissatisfaction with his appointed attorney. (*Sanchez*, *supra*, 53 Cal.4th at p. 90.) Nevertheless, under the circumstances of this case, the trial court's failure to address Weaver's letter does not require that we remand Weaver's case for a *Marsden* hearing.

When Weaver filed his letter with the trial court, Weaver had already been found incompetent. Weaver's complaints in the letter about his counsel—though not completely clear—were based primarily on his desire to "take this [case] to trial" and his opposition to Whitehead's alleged efforts to get him "<u>back</u> <u>into</u> the system." When Weaver next appeared in court with Whitehead, the trial court did not mention Weaver's *Marsden* request. But Weaver did receive a second competency evaluation, which confirmed the earlier finding of Weaver's lack of competency. Weaver personally thanked the court for appointing the second doctor to evaluate his competence.

These facts suggest that Weaver's expressed grievance and suspicion about counsel concerning competency were allayed by the trial court's decision to order the second evaluation. Moreover, Weaver did not mention his letter or otherwise complain about Whitehead at either of the court appearances he attended before he was transferred to Atascadero. Notably, during one court appearance Weaver was granted permission to address the trial court directly. The trial court gave Weaver permission to "speak freely," and Weaver did not mention his request for new counsel.

After Weaver was restored to competency and returned to court in January 2017, Weaver received what he sought in his *Marsden* letter—a new lawyer to replace Whitehead (i.e., Page) and, ultimately, a trial. Weaver did not request in his letter that the "Page firm" be relieved from the case; rather he asked the court "to relieve Ms. Whitehead of her position" defending him. Moreover, there is no indication of a conflict of interest between Weaver and the entire Page law firm. Thus, we do not presume that

13

Weaver's request to discharge Whitehead included all members of the Page firm. (See *People v. Henning* (2009) 178 Cal.App.4th 388, 403–404.)

Weaver appeared in court more than 30 times after Page took over the representation—including once with public defender Minsloff. During the 10 months from Weaver's return from Atascadero to his sentencing, Weaver did not mention his prior letter, complain about his counsel, or request that new counsel be appointed.

In *Jones*, the Court of Appeal found that the defendant's second handwritten *Marsden* motion was abandoned where repeated continuances of the case appeared to have resulted in an inadvertent failure to hold a hearing—after the trial court said it would—and the defendant did not again bring the matter to the court's attention despite 12 appearances before his trial. (*Jones*, *supra*, 210 Cal.App.4th at p. 362.) Weaver appeared at nearly triple the number of court sessions than the defendant in *Jones*, and Weaver was actually represented by a different lawyer than the lawyer about whom he complained in his letter.

Although Weaver insists on appeal that he did not abandon his *Marsden* request, we are not persuaded by Weaver's reliance on *Armijo* to alter our conclusion about the applicability of abandonment here. *Armijo* is distinguishable from the circumstances in this case. In *Armijo*, the defendant had limited opportunity to request a ruling on his second, unaddressed *Marsden* letter.[6] The defendant's second letter was dated five days before the next scheduled pretrial conference (but was not received by the court until three days after the conference). (*Armijo*, *supra*, 10 Cal.App.5th at pp. 1176–1177.) Thereafter, the defendant appeared twice more with his counsel (within a little more than two months) and entered a negotiated plea at the second appearance. (*Id*. at p. 1177.)

---

[6] The defendant's first, unaddressed *Marsden* letter "was rendered moot" because the defendant happened to "g[e]t what he wanted in the first letter[:] a new lawyer" at the court appearance following the letter's submission. (*Armijo*, *supra*, 10 Cal.App.5th at p. 1180.)

The court in *Armijo* noted that there was no indication defense counsel knew of the *Marsden* letter and opined that the defendant may have mistakenly believed it would have been futile to ask for new counsel after he submitted his second letter. (*Id*. at pp. 1182–1183.) Under these circumstances, the court declined to find that the defendant abandoned his *Marsden* request by his failure to press for hearing or acquiescence to the court's failure to hold a hearing. (*Ibid*.) Here, Weaver attended dozens of court appearances after he submitted his letter and, based on experience, he was aware that the trial court was amenable to his requests to speak in court.

We conclude that Weaver abandoned his request for new counsel by failing to follow up on that request despite ample opportunity to do so and because he received new counsel after being restored to competence. In addition, Weaver's asserted dissatisfaction with Whitehead appeared to be that she would not take his case to trial. Weaver's next counsel did take his case to trial, and it is unsurprising that Weaver never renewed his *Marsden* request.

Under the specific circumstances of this case, we conclude that Weaver abandoned his *Marsden* motion and therefore we need not remand the case for a hearing on a *Marsden* motion that was made during and related to the relatively brief pretrial period in which Weaver was mentally incompetent and the proceedings were suspended.

B. *Evidence of Prior Battery*

Weaver contends that the trial court abused its discretion when it admitted evidence of the battery on Richard under Evidence Code section 1101, subdivision (b) (hereafter Evidence Code section 1101(b)). Specifically, Weaver argues that his punching Richard during the confrontation with a 7-Eleven store clerk was irrelevant to show motive or an intent to threaten Paige or Damon.[7] In addition, Weaver asserts that the error was prejudicial under any standard of prejudice.

---

[7] We note that Weaver does not argue on appeal that the trial court also erred under Evidence Code section 352.

15

1. Background

The prosecutor moved in limine to present evidence of the battery on Richard.[8] The prosecutor argued that the incident was relevant under Evidence Code section 1101(b) because it showed that " 'race' seems to be a[n] underlying theme and motive for [Weaver's] actions" in that Weaver "allege[d] some kind of racial discrimination on each victim." In addition, the prosecutor asserted that the prior incident corroborated the current victims' statements about the charged crimes, and "[i]f the . . . witnesses['] credibility in the current felony case is attacked, the two prior cases are even more probative to the People's case in chief."

At a hearing on the motion in limine, defense counsel argued that the battery on Richard was not sufficiently similar to the charged crimes because "[t]here was no threat . . . to [Richard]." Thus, counsel argued, the evidence did not have probative value—other than to show propensity for violence—and was too prejudicial. The prosecutor responded that in both the prior incident and the charged crimes Weaver "reference[d] race as the underlying issue of why [he was] targeting someone," and he "[went] after the store clerk when he [felt] like he's being targeted because of his race also, just like [the current crime] victims." The prosecutor also reiterated his written argument regarding corroborative support of the victims' credibility. Defense counsel noted that the prosecutor's latter argument assumed that the defense would challenge the victims' credibility and thus was "more suitable for rebuttal." The trial court ruled that "the 7-Eleven incident [could] be presented . . . under [Evidence Code section] 1101(b), as probative to establish motive, similar motive, . . . for [Weaver's] conduct, given—real or not—perceived racial concerns."

As detailed above, Richard testified to his encounter with Weaver at the 7-Eleven store about two weeks before the charged crimes. Richard recounted that Weaver yelled

[8] The prosecutor also sought admission of a second battery. The trial court, however, excluded evidence of that battery. Thus, we do not discuss the second battery.

16

at the store clerk, "You're a racist." After Richard intervened, Weaver asked Richard what he was going to do about Weaver's knife and moved toward Richard in a "challenging manner." Richard told the clerk to call the police and Weaver responded by yelling at, spitting on, and striking Richard in the head.

Without objection by the defense, the trial court instructed the jury with CALCRIM No. 375 on both motive and intent related to the uncharged offense.[9]

    2. Analysis

"Evidence Code section 1101, subdivision (a) sets forth the ' "strongly entrenched" ' rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299 (*Jackson*).) "At the same time, 'other crimes' evidence is admissible under Evidence Code section 1101, subdivision (b) 'when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes.' " (*Id.* at p. 300.)

" 'When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value

_____

[9] The jury instruction read as follows: "The People presented evidence that the defendant committed another offense that was not charged in this case; specifically, the incident at 7-Eleven. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offense. [¶] . . . If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the offense, you may but are not required to consider that evidence for the limited purpose of deciding whether, one, the defendant acted with the intent to have his statement taken as a threat; or, two, the defendant had a motive to commit the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offenses. Do not consider this evidence for any other purpose. Do not conclude from the evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Counts 1 and 2. The People must still prove every charge beyond a reasonable doubt."

17

of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.  [Citation.]  Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).)

"In this inquiry, the degree of similarity of criminal acts is often a key factor, and 'there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought:  "The least degree of similarity . . . is required in order to prove intent . . . ." . . . By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity.' " (*Jackson*, *supra*, 1 Cal.5th at p. 300.)

Regarding intent, " '[t]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.]  In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

"Other crimes evidence is admissible to establish two different types or categories of motive evidence." (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381 (*Spector*).)  The first category concerns an uncharged act that " 'supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' " (*Ibid.*)  The second category concerns an uncharged act that " 'evidences the existence of a motive, but the act does not supply the motive. . . .  [T]he motive is the cause, and both the charged and uncharged acts are effects.  *Both crimes are explainable as a result of the same motive.*' " (*Ibid.*)  "A person's own prior misconduct may be admissible . . . to show that in light of

18

the prior conduct the person must have harbored a similar intent or motive during the charged offense." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1258.) However, "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.)

We review the trial court's admission of uncharged acts evidence for an abuse of discretion. (*People v. Abilez* (2007) 41 Cal.4th 472, 500.) "A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

We find no abuse of discretion in the trial court's admission of evidence concerning the incident at the 7-Eleven as probative of intent and motive. Weaver confronted the store clerk, challenged Richard about the knife, and then resorted to violence as Richard was attempting to direct him out of the store and summon the police. Weaver's actions were sufficiently similar to those he took against Paige when she told Weaver he could not use the shower and Damon when he stood between Weaver and Paige to justify admission of the evidence. The jury could reasonably have concluded from Weaver's actions at the 7-Eleven that he wanted his threats against Paige and Damon to be taken seriously. Accordingly, the evidence was relevant to prove the requisite specific intent under section 422. (See *People v. Toledo* (2001) 26 Cal.4th 221, 227–228; see also *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145.)

Further, the evidence of the 7-Eleven incident was probative of Weaver's motive in that his articulated perception of racial concerns prompted him to act against the store clerk and Richard and later Paige and Damon. Both the uncharged offense and the charged crimes were similar and explainable for the same reason. (See *Spector*, *supra*, 194 Cal.App.4th at p. 1381.) That is, "the other crimes evidence in this case was

admissible because it tended to show [Weaver] had acted with the same state of mind or 'state of emotion' in both the charged and the uncharged offenses." (*Id*. at p. 1383; see also *Fuiava*, *supra*, 53 Cal.4th at pp. 668–669.)

In sum, the challenged evidence was relevant, and the jury was properly instructed that the evidence was admitted for a limited purpose only. We reject Weaver's contention that the trial court abused its discretion in admitting this evidence.

C. *Mental Health Diversion Under Section 1001.36*

In a supplemental opening brief, Weaver claims that we should conditionally reverse the judgment and remand this matter for a hearing to determine his eligibility for pretrial mental health diversion under section 1001.36.[10] Weaver argues that *People v. Frahs* (2018) 27 Cal.App.5th 784 (*Frahs*), review granted on December 27, 2018, S252220, controls this case. In *Frahs*, the Fourth District Court of Appeal, Division Three, concluded that section 1001.36 applies retroactively to cases not yet final on appeal. (*Frahs*, *supra*, at p. 791.) The *Frahs* court remanded the case to the superior court with directions to conduct a diversion eligibility hearing, because the record disclosed that appellant apparently met at least one of the threshold requirements under section 1001.36 (i.e., a diagnosed mental disorder). (*Frahs*, *supra*, at p. 791.)[11]

---

[10] Section 1001.36 was passed by the Legislature as part of a health care budget bill—Assembly Bill No. 1810 (2017-2018 Reg. Sess.)—and took effect on June 27, 2018, during the pendency of Weaver's appeal. (Stats. 2018, ch. 34, §§ 24, 37.) Three months later, the statute was amended by Senate Bill No. 215 to, among other things, prohibit mental health diversion in cases involving certain crimes. (§ 1001.36, subd. (b)(2)(A)-(H); Stats. 2018, ch. 1005, § 1.) The amendment took effect on January 1, 2019. (See Cal. Const., art. IV, § 8, subd. (c)(1).) Weaver's crimes continue to be eligible for mental health diversion.

[11] The questions before the California Supreme Court on review of *Frahs* are whether section 1001.36 applies retroactively to all cases in which the judgment is not yet final and whether the Court of Appeal erred by remanding for a determination under section 1001.36. (*People v. Frahs* (Dec. 27, 2018) 242 Cal.Rptr.3d 417 (Mem).)

The Attorney General raises several arguments in opposition to Weaver's claim. The arguments include that the language of section 1001.36 reveals it was not intended to apply retroactively, the legislative history supports prospective application, the reasoning of the court in *Frahs* is not compelling, and, even if section 1001.36 were to be applied retroactively, it is not appropriate to remand whenever there is proof in the record of simply one of the six statutory preconditions for diversion.[12]

After completion of supplemental briefing, the Fifth District Court of Appeal decided *People v. Craine* (2019) 35 Cal.App.5th 744 (*Craine*). The court in *Craine* held that "section 1001.36 does not apply retroactively to defendants whose cases have progressed beyond trial, adjudication of guilt, and sentencing." (*Id*. at p. 760.) The court recognized, in accord with *Frahs*, that section 1001.36 "confers a potentially ameliorative benefit to a specified class of persons." (*Craine*, *supra*, at p. 754.) However, contrary to *Frahs*, the court in *Craine* concluded "the text of section 1001.36 and its legislative history contraindicate a retroactive intent with regard to defendants . . . who have already been found guilty of the crimes for which they were charged." (*Id*. at p. 749.)

1. Statutory Overview

Section 1001.36 creates a "pretrial diversion" program for certain defendants who suffer from a diagnosed and qualifying mental disorder. (§ 1001.36, subd. (b)(1)(A).) The stated purpose of the statute "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of

---

[12] The Attorney General requested that we take judicial notice of an Assembly Floor Analysis (as amended on June 12, 2018) of Assembly Bill No. 1810. Weaver did not file a response to the request. Rather, he argued in his supplemental briefing that "neither the statute's language nor the legislative history contradict the Legislature's stated purpose in passing Assembly Bill 1810." Accordingly, we grant the Attorney General's request for judicial notice. (Evid. Code, §§ 452, 459; Cal. Rules of Court, rule 8.252.)

diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.)

Under the statutory scheme, a trial court may "grant pretrial diversion to a defendant pursuant to this section if the defendant meets all of the requirements specified in paragraph (1) of subdivision (b)." (§ 1001.36, subd. (a).) The statute includes six requirements that the trial court must find before granting diversion.[13] "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. . . . If a prima facie showing is not made, the court may summarily deny the request for diversion or grant any other relief as may be deemed appropriate." (§ 1001.36, subd. (b)(3).)

The statute defines " 'pretrial diversion' " as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," subject to multiple restrictions. (§ 1001.36, subd. (c).)

If a defendant meets the six requirements in paragraph (1) of subdivision (b), the trial court may order pretrial diversion into an approved mental health treatment program

---

[13] First, the trial court must be "satisfied that the defendant suffers from a mental disorder" as described in the statute, and the evidence provided "shall include a recent diagnosis by a qualified mental health expert." (§ 1001.36, subd. (b)(1)(A).) Second, the court must also be satisfied that "the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) Third, "a qualified mental health expert" must opine that "defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) Fourth, subject to certain exceptions related to incompetence, the defendant must consent to diversion and waive his or her right to a speedy trial. (§ 1001.36, subd. (b)(1)(D).) Fifth, the defendant must agree to "comply with treatment as a condition of diversion." (§ 1001.36, subd. (b)(1)(E).) And finally, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(1)(F).)

for a maximum period of two years.  (§ 1001.36, subd. (c)(1), (c)(3).)  If the defendant commits additional crimes or otherwise performs unsatisfactorily in the diversion program, the trial court may reinstate the criminal proceedings.  (§ 1001.36, subd. (d).)  "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion."  (§ 1001.36, subd. (e).)  The statute further provides that "the arrest upon which the diversion was based shall be deemed never to have occurred" (§ 1001.36, subd. (e)) and imposes certain limitations on access to related records when diversion is successfully completed.  (§ 1001.36, subd. (f).)

## 2.  Legal Principles Regarding Retroactivity

Penal statutes are generally presumed to apply prospectively unless they expressly state otherwise.  (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287; § 3.)  However, under *In re Estrada* (1965) 63 Cal.2d 740, "an amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date."  (*People v. Floyd* (2003) 31 Cal.4th 179, 184 (*Floyd*), citing *Estrada*, at p. 744; see also *In re Kirk* (1965) 63 Cal.2d 761, 762–763.)

"Because the *Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses."  (*People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*); see also *People v. DeHoyos* (2018) 4 Cal.5th 594, 601 (*DeHoyos*).)  Although "express statements unquestionably suffice to override the *Estrada* presumption, the 'absence of an express saving clause . . . does not end "our quest for legislative intent." ' "[14]  (*Conley*, at p. 656.)

---

[14] An example of an express saving clause can be found in Proposition 36, the Substance Abuse and Crime Prevention Act of 2000.  The California Supreme Court in

Case law "do[es] not 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require 'that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' " (*Conley*, *supra*, 63 Cal.4th at pp. 656–657.)  Stated differently, "[t]he *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 881 (*Buycks*).)

Regarding the scope of the *Estrada* inference, recently in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, the California Supreme Court decided "whether [the] requirement of a transfer hearing before a juvenile can be tried as an adult applie[d] to [a] defendant even though he had already been charged in adult court before Proposition 57 took effect." (*Id*. at p. 306.)  The court held that "the same inference of retroactivity" under *Estrada* applies to a statutory amendment that merely "ameliorated the possible punishment for a class of persons." (*Id*. at p. 308.)  The court further concluded that "[n]othing in Proposition 57 itself or the ballot materials rebuts this inference. . . .  They are inconclusive." (*Id*. at p. 309.)

### 3. Analysis

There is no dispute here that section 1001.36 confers a potentially ameliorative benefit to a specified class of persons, i.e., defendants with certain diagnosed mental

---

*Floyd* "conclude[d] that the act's saving clause—which states that '[e]xcept as otherwise provided, the provisions of this act shall become effective July 1, 2001, and its provisions shall be applied prospectively' [citation]—indicates the act was not intended to apply retroactively" to cases not yet final as of the act's effective date. (*Floyd*, *supra*, 31 Cal.4th at p. 182.)

disorders.[15] We agree with the parties regarding the potential benefit of section 1001.36. (*Frahs*, *supra*, 27 Cal.App.5th at p. 791; *Craine*, *supra*, 35 Cal.App.5th at p. 754.)  Thus, the question before us is whether the Legislature " ' "clearly signal[ed] its intent" ' " to overcome the *Estrada* presumption that section 1001.36 will apply to individuals who were convicted and sentenced before the section took effect but whose cases, like Weaver's, are not yet final on appeal.  (See *People v. Lara* (2019) 6 Cal.5th 1128, 1134 (*Lara*).)

Weaver urges us to adopt the conclusion of the court in *Frahs* and hold that the pretrial diversion scheme set out in section 1001.36 applies to him, even though he has already been convicted following a jury trial and sentenced to prison.  The Attorney General contends that the statute's definition of " 'pretrial diversion' " as the "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication" (§ 1001.36, subd. (c)) "rebuts '*Estrada*'s inference of retroactivity.' "

The California Supreme Court has recently decided a number of cases analyzing *Estrada*, and the court has made clear that the burden to overcome the *Estrada* inference is substantial.  For example, in *Lara*, *supra*, 6 Cal.5th 1128, the Supreme Court reiterated that "under *Estrada*, ' "[a]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date" [citation], unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent." ' "  (*Id.* at p. 1134 citing *DeHoyos*, *supra*, 4 Cal.5th at p. 600 and *People v. Nasalga* (1996) 12 Cal.4th 784, 791–794.)

---

[15] The Attorney General concedes that "section 1001.36 has a potentially ameliorative effect," but he argues that section 1001.36 contains "direct language indicating pretrial mental health diversion is not to be available retroactively."

The California Supreme Court's decisions in *DeHoyos* and *Lara* highlight the strength of the *Estrada* inference and the demanding standard required to overcome its presumption. In *DeHoyos*, the court "employed [the *Estrada*] framework to determine whether Proposition 47's amended penalty provisions apply automatically—that is, without need for a resentencing petition under section 1170.18—to defendants who were serving felony sentences as of Proposition 47's effective date but whose sentences had not yet become final on appeal." (*Lara*, *supra*, 6 Cal.5th at p. 1134.) The Supreme Court concluded that the detailed petition process set out in Proposition 47 demonstrated that the electorate intended that convicted persons use the petition process to secure Proposition 47 relief, rather than intending that Proposition 47 apply directly to them.

The court observed that, although "Proposition 47 contains no express savings clause[,] [i]t does . . . address the question of retrospective application in conspicuous detail." (*DeHoyos*, *supra*, 4 Cal.5th at p. 601.) The court explained that the proposition contains "[s]eparate provisions [that] articulate the conditions under which the new misdemeanor penalty provisions apply to completed sentences [citation], sentences still being served [citation], and sentences yet to be imposed." (*Ibid.*) Thus, "Proposition 47 . . . is 'not silent on the question of retroactivity,' [(as was the case in *Estrada*)] but instead contains a detailed set of provisions designed to extend the statute's benefits retroactively." (*Id.* at p. 603.) The court further said that its "holding here, like [its] conclusion in *Conley*, depends on a conclusion about the intended operation of a statutory scheme that provides a particular mechanism for the retroactive application of the ameliorative changes the measures brought about; it does not depend on the relative scope or scale of those changes."[16] (*DeHoyos*, *supra*, at p. 605.)

---

[16] Similarly, in *People v. Yearwood* (2013) 213 Cal.App.4th 161, the Court of Appeal concluded that section 1170.126's recall petition requirement (enacted by Proposition 36) was "the functional equivalent of a saving clause," unambiguous, and demonstrated voter intent that "a petition for recall of sentence to be the sole remedy available" for defendants seeking retroactive application. (*Yearwood*, *supra*, at p. 172.)

26

The California Supreme Court reached a different conclusion in a Proposition 47 case examining application of the initiative to defendants who had not yet been sentenced when Proposition 47 went into effect. In *Lara*, the court explained that Proposition 47 "does not expressly address reduction of punishment for a defendant who had not yet been sentenced on its effective date. On the contrary, Proposition 47's resentencing provisions are simply silent on the subject of retroactivity as to such a defendant." (*Lara*, *supra*, 6 Cal.5th at p. 1135.) The court concluded, "In the absence of contrary indications, we may therefore presume under *Estrada* that the enacting body intended Proposition 47's reduced penalties to apply in this category of nonfinal cases. [¶] We therefore agree with the parties that the applicable ameliorative provisions of Proposition 47 (here, Pen. Code, § 490.2) apply directly in trial and sentencing proceedings held after the measure's effective date, regardless of whether the alleged offense occurred before or after that date." (*Ibid*.)

Although the California Supreme Court's cases do not " 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change" (*Conley*, *supra*, 63 Cal.4th at p. 656), recent decisions make clear that the standard of "sufficient clarity" to overcome the *Estrada* presumption imposes a heavy burden. The only statutes the Supreme Court have recently found sufficiently clear to overcome the *Estrada* presumption are those containing an explicit statement to that effect (absent, for example in *Lara*, and present in *Floyd*) or creating an alternative mechanism, such as a petition requirement, that individuals who have already been convicted must satisfy (as in *DeHoyos*).

Typically, "[w]hen we interpret statutes, our primary task is to determine and give effect to the Legislature's purpose in enacting the law. [Citations.] We first look to the words of the statute, as they are generally the most reliable indicators of the legislation's purpose. [Citations.] To further our understanding of the intended legislative purpose, we consider the ordinary meaning of the relevant terms, related provisions, terms used in

27

other parts of the statute, and the structure of the statutory scheme." (*In re H.W.* (2019) 6 Cal.5th 1068, 1073.)

However, *Estrada* employs a different lens on legislative intent. The rule "supports an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively: When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.] We based this conclusion on the premise that ' "[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." ' [Citation.] ' "Nothing is to be gained," ' we reasoned, ' "by imposing the more severe penalty after such a pronouncement . . . other than to satisfy a desire for vengeance" ' [citation]—a motive we were unwilling to attribute to the Legislature." (*People v. Brown* (2012) 54 Cal.4th 314, 323, footnote and italics omitted.) This reasoning underlies the demanding standard reflected in the California Supreme Court's recent cases examining the *Estrada* presumption.

We recognize that application of section 1001.36 to individuals who have already been convicted but whose convictions are not yet final on appeal may appear to conflict with several aspects of the provision's text. In particular, the statute's definition of "pretrial diversion" states that diversion is available only "until adjudication." (§ 1001.36, subd. (c).) As the *Craine* court observed, "adjudication" is a "shorthand for the adjudication of guilt or acquittal" (*Craine*, *supra*, 35 Cal.App.5th at p. 755) and "[a]t most . . . could be synonymous with the rendition or pronouncement of judgment, which occurs at the time of sentencing." (*Ibid.*) When a case is remanded to the trial court for potential diversion after the defendant has been sentenced, the term " 'until adjudication' " is rendered surplusage. (*Ibid.*) Further, as the *Craine* court explained,

28

"pretrial diversion is literally and functionally impossible once a defendant has been tried, found guilty, and sentenced.  Upon reaching this point of 'adjudication,' the 'prosecution' is over and there is nothing left to postpone.  (§ 1001.36, subd. (c).)"  (*Id*. at p. 756.)

In addition, the statute requires that the defendant consent to diversion and "waive[] his or her right to a speedy trial . . . ."  (§ 1001.36, subd. (b)(1)(D).)  A defendant who has been tried and sentenced no longer has a speedy trial right to waive. (See *Betterman v. Montana* (2016) 136 S.Ct. 1609, 1618 [2016 U.S. Lexis 3349]; *People v. Domenzain* (1984) 161 Cal.App.3d 619, 622.)  Furthermore, as the court in *Craine* observed, the provision addressing the dismissal of charges and the limits on access to records after satisfactory completion of diversion (namely subdivision (e)) uses "preadjudicative language to describe these benefits."  (*Craine*, *supra*, 35 Cal.App.5th at p. 757.)

However, contrary to the reading of this language by the court in *Craine*, we view these portions of the statute as demonstrating the Legislature's intent that individuals who commit their crimes after the effective date of section 1001.36 and whose guilt has been adjudicated in the form of a plea of guilty or no contest or a conviction after trial are no longer eligible for pretrial diversion under the statute.  But for individuals like Weaver, whose convictions are not yet final on appeal but were never given an opportunity for diversion because they were convicted prior to the statute's effective date, we see nothing in the text of section 1001.36 sufficient to overcome the *Estrada* presumption.

For example, the Legislature did not include in section 1001.36 an "express savings clause" mandating prospective application.  In addition, we conclude that the statute's creation of a pretrial mental health diversion scheme does not " ' "clearly signal[]" ' " the Legislature's intent to bar retroactive application.  (See *Lara*, *supra*, 6 Cal.5th at p. 1134.)

29

Unlike Proposition 47—which by its terms "address[ed] the question of retrospective application [to defendants who had already been sentenced] in conspicuous detail" (*DeHoyos*, *supra*, 4 Cal.5th at p. 601)—section 1001.36 is not clear regarding its application to cases not yet final on appeal at the time of its enactment.  The statute does not "contain any language indicating that it otherwise limits or subsumes the ordinary presumption long established under the *Estrada* rule."[17]  (*Buycks*, *supra*, 5 Cal.5th at pp. 882–883.)  Given the legislative clarity demanded by recent cases examining *Estrada* and retroactivity, statutory ambiguity does not suffice to overcome the *Estrada* presumption.  Accordingly, we cannot conclude that the Legislature has " ' "clearly signal[ed] its intent" ' " (*Lara*, *supra*, 6 Cal.5th at p. 1134) that section 1001.36 apply only prospectively, and the *Estrada* inference of retroactivity therefore is not rebutted.

Having concluded that section 1001.36 applies retroactively to Weaver, we must decide whether this case should be remanded to the trial court for a determination

---

[17] We also note that the legislative history of the original section 1001.36—as passed in Assembly Bill No. 1810—shows that the text of the final bill was significantly broader than its original version.  The drafters did not import certain limitations concerning the scope of the program that existed in pending Senate Bill No. 215, which appears to be a forerunner of the original section 1001.36.  Specifically, when Assembly Bill No. 1810 passed in June 2018, the mental health diversion program then proposed in pending Senate Bill No. 215 (as section 1001.82) required the consent of the prosecution before diversion could be ordered if certain crimes were charged, including "any felony" (with the exception of certain Health and Safety Code and Vehicle Code offenses), "any offense involving the unlawful use or unlawful possession of a firearm," a "violation of section 192 or 192.5," an "offense for which a person, if convicted, would be required to register pursuant to Section 290, except for a violation of Section 314," a "violation of Section 273a, 273.5, 368, 597, or 646.9," an "offense resulting in damages of more than five thousand dollars ($5,000)," and an "offense that occurs within 10 years of three separate referrals to diversion pursuant to this section."  (Assembly Amend. to Sen. Bill No. 215 (2017-2018 Reg. Sess.) June 14, 2018, <http://leginfo.legislature.ca.gov/faces/billVersionsCompareClient.xhtml?bill_id=201720 180SB215&cversion=20170SB21594AMD> (as of Jun. 28, 2019), archived at: <https://perma.cc/4BYN-8XSE>.)  This prosecutorial-consent requirement and these statutory exceptions to diversion were not included in the final version of the statute contained in Assembly Bill No. 1810.  (Stats. 2018, ch. 34, § 24.)

regarding Weaver's eligibility for mental health diversion. The *Frahs* court suggested that remand is appropriate when "the record affirmatively discloses that [the defendant] appears to meet at least one of the threshold requirements" of section 1001.36, subdivision (b)(1). (*Frahs*, *supra*, 27 Cal.App.5th at p. 791.) The record here affirmatively discloses that Weaver appears to meet at least one of the threshold requirements, namely, he suffers from a diagnosed mental health disorder. (See § 1001.36, subd. (b)(1)(A).)

In sum, we conclude that the Legislature did not " ' "clearly signal[] its intent" ' " to overcome the *Estrada* presumption that section 1001.36 will apply to individuals who, like Weaver, were convicted and sentenced before the statute's effective date but whose cases were not yet final on appeal. (*Lara*, *supra*, 6 Cal.5th at p. 1134.)

## III. DISPOSITION

The judgment is conditionally reversed. The matter is remanded to the trial court with directions to hold a hearing under Penal Code section 1001.36 to determine whether to grant Weaver diversion under that statute. If the trial court grants diversion, it shall proceed in accordance with that statute. If Weaver performs satisfactorily in diversion, the trial court shall dismiss the charges. (§ 1001.36, subd. (e).) If the trial court does not grant diversion, or if it grants diversion but Weaver does not satisfactorily complete diversion (§ 1001.36, subd. (d)), then the trial court shall reinstate the judgment.

_____

DANNER, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

BAMATTRE-MANOUKIAN, J.

*People v. Weaver*
**H045301**

| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. 16CR04023 |
|---|---|
| Trial Judge: | Hon. Stephen .S. Siegel<br>John Salazar |
| Counsel for Plaintiff/Respondent:<br>The People | Xavier Becerra<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Donna M. Provenzano<br>Supervising Deputy Attorney General<br><br>Amit Kurlekar<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>Christopher Weaver | Under appointment by the Court of<br>Appeal<br>Rudolph J. Alejo |

*People v. Weaver*
**H045301**